PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

BENNY IKO, Personal representative
of the Estate of Ifeanyi A. Iko;
LOREEN JONES, as parent and next
friend of her minor son, BI;
CHRISTINE IKO,
              *Plaintiffs-Appellees,*

                v.

JAMES SHREVE, Lieutenant; BRIAN
CLISE, Correctional Officer; LYN
DETRICK, Correction Officer; JASON
HARBAUGH, Correctional Officer;
MARK RALEY, Correctional Officer;
ADAM WHITACRE, Correction Officer;
RUSSELL SUDER, Correctional
Sergeant; PAUL F. DEFFIBAUGH,
Correctional Officer,                        No. 07-7569
              *Defendants-Appellants,*

               and

JON P. GALLEY, Warden;
CORRECTIONAL OFFICERS; JOHN DOES
I THROUGH VI, WESTERN
CORRECTIONAL INSTITUTION; MICHAEL
JACOBS, Correction Lieutenant;
ALLAN HALL, Correctional Sergeant;
ROBERT TICHNELL; RUSSELL ZANG,
Correctional Lieutenant, Western
Correctional Institution; LOUISE
GORDON, Chief of Security, Western
Correctional Institution,
              *Defendants.*

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Deborah K. Chasanow, District Judge.
(8:04-cv-03731-DKC)

Argued: May 14, 2008

Decided: August 6, 2008

Before MICHAEL and DUNCAN, Circuit Judges,
and Henry F. FLOYD, United States District Judge for the District
of South Carolina, sitting by designation.

_____

Dismissed in part and affirmed in part by published opinion. Judge
Duncan wrote the opinion, in which Judge Michael and Judge Floyd
joined.

_____

**COUNSEL**

**ARGUED:** Stephanie Judith Lane-Weber, OFFICE OF THE
ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland,
for Appellants. Paul Lawrence Knight, O'CONNOR & HANNAN,
LLP, Washington, D.C., for Appellees. **ON BRIEF:** Douglas F.
Gansler, Attorney General of Maryland, Baltimore, Maryland, for
Appellants. Gary C. Adler, ROETZEL & ANDRESS, LPA, Washing-
ton, D.C., for Appellees.

_____

**OPINION**

DUNCAN, Circuit Judge:

Ifeanyi Iko ("Iko"), an inmate in a Maryland state correctional
facility, died after being forcibly removed from his cell and trans-
ferred to another cell by a team of seven correctional officers
("Appellants," or the "officers"). Iko's estate and family ("Plaintiffs")

filed this survival and wrongful death action against the officers pursuant to 42 U.S.C. § 1983. The officers moved for summary judgment based on qualified immunity. The district court granted the motion in part, finding the officers entitled to qualified immunity from suit for certain of their actions but not for others.

The officers filed this interlocutory appeal, asserting that they are entitled to qualified immunity from the entire action. Plaintiffs have moved to dismiss the appeal, arguing that this court has no jurisdiction to consider it because it improperly calls for revisiting whether there remains a genuine dispute of material fact. We find that the officers' appeal, though attempting to re-litigate certain factual disagreements, also presents legal questions regarding whether the officers are entitled to qualified immunity as to certain claims when the facts are viewed in the light most favorable to Plaintiffs. We therefore dismiss the appeal in part, and affirm the district court's denial of qualified immunity in part, because Plaintiffs have alleged facts sufficient to show that the officers violated certain of Iko's clearly established Eighth Amendment rights.

## I.

### A.

"[C]ourts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion. In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." *Scott v. Harris*, 127 S. Ct. 1769, 1774-75 (2007) (internal quotations, alterations, and citations omitted). At the same time, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 1776. In particular, where, as here, the record contains an unchallenged videotape capturing the events in question, we must only credit the plaintiff's version of the facts to the extent it is not contradicted by the videotape. *See id.*[1]

---

[1]Indeed, the videotape in *Scott* proved instrumental in the Court's decision. In reversing, the Court found that the plaintiff's version of the facts

Iko was a long-time inmate at Western Correctional Institution ("WCI"), a large state prison in Cumberland, Maryland. Iko had been involved in a number of violent prison incidents dating to 1992, including assaults on correctional officers and other inmates. Some of these incidents involved spitting or biting. Iko had also exhibited intermittent mental-health problems, with "periods of well-adjusted socially appropriate behavior" punctuated by violent outbursts and other "reclusive[,] uncooperative behavior." J.A. 219.

The events leading to Iko's death began on April 28, 2004, when Iko was involved in a violent altercation with his cellmate. Correctional officers broke up the fight by administering pepper spray to the inmates.[2] Iko was taken for medical attention and moved to an isolation cell.

Appellant Lieutenant James Shreve ("Lt. Shreve"), the manager of Iko's housing unit, attempted to initiate conversation with Iko several times after the fight, but had difficulty communicating with him. Iko responded to Lt. Shreve's entreaties by "just kind of star[ing] at [him]" or by "sp[eaking] to [him] in a language that [Lt. Shreve] didn't understand." J.A. 211. Because Lt. Shreve generally found Iko to be "a very intelligent person to talk to [who] can speak English," he became concerned about this behavior and requested that someone from the prison's psychology department visit Iko. *Id.*

Over the next two days, three different members of the prison mental-health staff visited Iko in his temporary cell. Though Iko was communicative during some of those visits, his erratic behavior continued. On April 30, 2004, prison psychologist Dr. Janet Hendershot

---

was "utterly discredited by the record [such] that no reasonable jury could have believed him." *Id.* at 1776. The Court concluded that the Court of Appeals erred in "rel[ying] on such visible fiction; it should have viewed the facts in the light depicted by the videotape." *Id.*

[2]Plaintiffs suggest that the officers responding to the fight handled Iko violently, citing the testimony of several inmates who allegedly witnessed the incident. The district court did not admit this testimony for purposes of analyzing the officers' motion for summary judgment, and that determination has not been challenged on appeal. The testimony is therefore not properly before us.

("Dr. Hendershot") recommended that Iko be transferred to a cell in the "Special Observation Housing" ("SOH") unit, where he would receive more frequent observation and medical attention. The transfer was scheduled for later that day.

Just prior to the scheduled transfer, Dr. Hendershot encouraged Iko to "cuff up" by inserting his wrists through a slot in the cell door, so that he would not have to be transferred by force. When Iko did not respond, the chief of security and the prison warden authorized his transfer to an SOH cell by force.

To effectuate the transfer, prison authorities utilized a procedure called a "cell extraction." A team of seven correctional officers (the "extraction team") was assembled, led by Lt. Shreve. Each member of the team was assigned a role. For example, one officer was responsible for restraining the inmate's left leg and one his right. The team members wore protective vests, gas masks, gloves, and hard knee and elbow caps. Standing prison procedures authorized the extraction team to use force if and to the extent necessary to secure compliance. The cell extraction was videotaped pursuant to state policy.[3]

The general sequence of the events of the transfer is undisputed, and comports with the depiction in the videotape. Immediately prior to the cell extraction, Iko lay passively on the floor of his cell. Lt. Shreve told Iko that he could avoid the use of force if he came to the door to be handcuffed. When Iko did not move, Lt. Shreve deployed a pepper spray "fogger"[4] for several seconds through the door slot. Lt.

---

[3]According to the Maryland Secretary of the Department of Public Safety and Correctional Services:

> [C]ell extractions are videotaped in order to make a record of the event. The videotape is reviewed by correctional staff and supervisors to assess the conduct of the correctional staff and inmate and, if appropriate, to take any administrative, disciplinary, or law enforcement actions. The videotape is considered an integral part of any investigation into the circumstances of the cell extraction.

J.A. 333.

[4]Unlike a personal-use sprayer that releases a targeted stream, the "foggers" used here disperse the irritant in a diffuse mist.

Shreve then shut the slot door. When Iko did not come to the door, Lt. Shreve deployed another short burst of pepper spray. As he was doing so, Iko came to the door with his wrists and hands in front of him and his palms face down, and inserted them through the slot where the pepper spray was being deployed. Several officers then began shouting that Iko should instead turn around and place his hands behind his back and through the slot. When Iko did not do so, Lt. Shreve administered another burst of pepper spray, and Iko again lay down on the floor of his cell. Lt. Shreve and another officer each released a final burst of pepper spray and prepared to enter the cell. Plaintiffs' expert estimates that pepper spray was dispersed into Iko's cell for approximately nine to fourteen seconds in total. It is undisputed that at no point during the spraying did Iko respond violently or in a confrontational manner.

Iko was lying still on the floor when the extraction team entered his cell. They secured Iko's arms in metal handcuffs behind his back and his legs in shackles, and placed a spit mask over his head.[5]

The extraction team lifted Iko from the floor and, pursuant to standard cell-extraction procedure, walked him to a nearby medical room to be examined by a nurse. The nurse explained to Iko that she was there to offer medical treatment, but he did not respond, instead hang-

---

[5]Though not a standard part of the cell-extraction procedure, the use of a spit mask may be authorized for an inmate with a history of spitting or biting. As explained by the district court below, the type of spit mask used here was

> a hood that covers the wearer's face and head, . . . fastened by tying two straps under the armpits and through two loops in the back. A thin cloth, similar to the type used in doctors' surgical masks, covers the wearer's nose and mouth. A mesh material covers the wearer's eyes and back of his head. The instructions accompanying the spit mask read, "WARNING: IMPROPER USE OF THE SPIT NET MAY CAUSE INJURY OR DEATH . . . Wearer must be under constant visual supervision and should NEVER be left unattended. DO NOT USE on anyone that is . . . having difficulty breathing."

*Iko v. Galley*, No. 8:04-CV-3731-DKC, slip op. at 38 (D. Md. September 17, 2007) (latter two omissions in original).

ing his head as the officers propped him up. The nurse can be heard on the videotape commenting that Iko did not appear to be reacting to the pepper spray. After about a minute in the medical room, Iko suddenly collapsed forward. The officers caught him and directed him into a nearby wheelchair for transportation to the SOH cell. At no point did the nurse provide any medical treatment to Iko or even come into physical contact with him. Nor did the officers at any point remove Iko's spit mask or decontaminate him or his clothing, which was saturated with pepper spray. The officers then wheeled Iko to the SOH cell via an outdoor path, carrying Iko's legs in front of the wheelchair to keep them from dragging on the ground.

Upon his arrival at the SOH cell, Iko was placed face down on the floor. The officers dispatched someone to locate nylon "flex cuffs" to replace Iko's metal handcuffs. While the officers waited for the flex cuffs to arrive, they continued to restrain Iko by kneeling and otherwise exerting downward pressure on various parts of his body, including his head, neck, shoulders, stomach, waist and legs. The videotape confirms, for example, that at least one officer was kneeling, in hard knee caps, on Iko's back and shoulders throughout this process. After several minutes of constant pressure, the flex cuffs arrived. The officers exchanged the handcuffs and exited the cell, leaving Iko face down, arms restrained behind his back, and spit mask still on. After he left the cell, Lt. Shreve offered that Iko could come to the slot to have his cuffs removed, but Iko did not respond. The officers left.

Dr. Hendershot instructed the SOH staff to monitor Iko every fifteen minutes. At least one SOH staff member observed through the cell door that Iko was still breathing upon his arrival to the SOH unit. SOH staff soon became concerned, however, that Iko was not moving from his face-down position on the cell floor. After initially being denied permission by prison officials to enter the cell because of Iko's alleged dangerousness, SOH staff finally obtained authorization to enter, finding Iko dead. A state medical examiner later concluded that Iko "died of Asphyxia (the asphyxia was caused by chemical irritation of the airways by pepper spray, facial mask placement, compressional and positional mechanisms)." J.A. 1143.

### B.

As a result of Iko's death, Plaintiffs sued the officers in the United States District Court for the District of Maryland pursuant to 42 U.S.C. § 1983, claiming that the officers violated Iko's Eighth Amendment right to be free from cruel and unusual punishment. Plaintiffs also alleged a number of Maryland state constitutional and tort claims. The officers moved for summary judgment, asserting, inter alia, qualified immunity from the federal claims. The district court granted the motion in part, but denied it as to three portions of Plaintiffs' § 1983 action: (1) the claim that Lt. Shreve used excessive force in deploying a large quantity of pepper spray (the "excessive pepper spray claim"); (2) the claim that the officers used excessive force in applying pressure to Iko in the SOH cell while waiting for the flex cuffs to arrive (the "excessive pressure claim"); and (3) the claim that the officers showed deliberate indifference to Iko's medical needs after he was doused in pepper spray (the "medical needs claim").[6]

The district court held that, for each of these claims, Plaintiffs had alleged facts that, if proven true, would subject the officers to liability for violating Iko's Eighth Amendment rights.[7]

The officers timely filed this interlocutory appeal, challenging the district court's partial denial of their motion for summary judgment.

---

[6]The district court granted qualified immunity to the officers regarding Plaintiffs' claims that the use of restraints during the cell extraction constituted excessive force, and that the use of a spit mask and the failure to provide medical care in the SOH cell showed deliberate indifference to a medical need. Plaintiffs do not appear to contest these rulings on this interlocutory appeal. The district court also refused to grant summary judgment regarding the pendent state law claims. We would be reticent to review those pendent claims in this appellate posture, *see Johnson v. Jones*, 515 U.S. 304, 318 (1995), and the parties do not request that we do so.

[7]The district court likewise denied summary judgment to Lt. Shreve on Plaintiffs' claim that he is liable as a supervisor for the actions of the rest of the officers. The parties do not separately argue this claim on appeal, instead assuming it rises and falls with the officers' liability for the same acts. We therefore decline to revisit the district court's denial of summary judgment on this claim.

Plaintiffs moved to dismiss the appeal, arguing that this court does not have jurisdiction to entertain it under *Johnson v. Jones*, 515 U.S. 304. We address Plaintiffs' jurisdictional challenge first, as we must. *See Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986) ("[E]very federal appellate court has a special obligation to satisfy itself . . . of its own jurisdiction." (internal quotations omitted)).

## II.

## A.

The doctrine of qualified immunity protects government officials from liability for violations of constitutional rights that were not clearly established at the time of the challenged conduct. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is an "*immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Thus, though interlocutory appeals are generally disallowed, "a district court's denial of a claim of qualified immunity, *to the extent that it turns on an issue of law*, is [immediately appealable] notwithstanding the absence of a final judgment," under the collateral-order doctrine. *Id.* at 530 (emphasis added); *see also Behrens v. Pelletier*, 516 U.S. 299, 301 (1996); *Johnson v. Jones*, 515 U.S. at 313; *Winfield v. Bass*, 106 F.3d 525, 528 (4th Cir. 1997) (en banc).

Plaintiffs argue that we lack jurisdiction to hear this appeal because none of the questions presented on appeal "turns on an issue of law" related to qualified immunity. *See id.* at 530. Instead, Plaintiffs contend, the officers would have us revisit the district court's assessment of whether genuine issues of material fact make summary judgment inappropriate. Since *Johnson v. Jones* prevents such an inquiry, *see* 515 U.S. at 314, Plaintiffs conclude that we lack jurisdiction over the officers' entire appeal.

Plaintiffs are correct that we lack jurisdiction to re-weigh the evidence in the record to determine whether material factual disputes preclude summary disposition. *See id.*, 515 U.S. at 319-20 ("[A] defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order

determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial."); *see also Buonocore v. Harris*, 65 F.3d 347, 360 (4th Cir. 1995). That does not mean, however, that there may not remain purely legal questions relating to qualified immunity that can and should be resolved at this stage in the litigation. *See Johnson v. Jones*, 515 U.S. at 318 (pointing out that, had the district court "determined that beating respondent violated clearly established law, petitioners could have sought review of *that* determination"). This court, sitting en banc, summarized the distinction:

> [W]e possess jurisdiction to consider an appeal from a decision of a district court rejecting a government official's claim of entitlement to qualified immunity to the extent that the official maintains that the official's conduct did not violate clearly established law. Alternatively, to the extent that the appealing official seeks to argue the insufficiency of the evidence to raise a genuine issue of material fact—for example, that the evidence presented was insufficient to support a conclusion that the official engaged in the particular conduct alleged—we do not possess jurisdiction . . . to consider the claim and, therefore, may not do so absent some independent jurisdictional base. In other words, we possess no jurisdiction over a claim that a plaintiff has not presented enough evidence to prove that the plaintiff's version of the facts actually occurred, but we have jurisdiction over a claim that there was no violation of clearly established law accepting the facts as the district court viewed them.

*Winfield*, 106 F.3d 525, 529-30 (4th Cir. 1997) (internal citations omitted).

As *Winfield* makes plain, our first task on appeal is to separate the district court's legal conclusions regarding entitlement to qualified immunity, over which we have jurisdiction, from its determinations regarding factual disputes, over which we do not. The task is complicated by the fact that nearly every "decision of a district court denying a governmental official's request for summary judgment based upon qualified immunity will encompass" both a factual and a legal determination—"that the facts are sufficiently controverted to warrant a

trial *and* that the legal right purportedly violated was clearly established." *Id.* at 529 (emphasis added). We must therefore carefully "consider the order entered by the district court to assess the basis for its decision." *Id.* (citing *Johnson v. Jones*, 515 U.S. at 319). If summary judgment was denied as to a particular claim solely because there is a genuine issue of material fact, that claim is not immediately appealable and we lack jurisdiction to consider it. If instead summary judgment was denied as to a particular claim because the officers were found, on the facts viewed most favorably to Plaintiffs, to have violated Iko's clearly established constitutional rights, that claim is properly before us.

Once the district court's decision has been so parsed, we must also examine the parties' appellate arguments to ensure that we only consider those legal questions formally raised on appeal. *See id.* at 530.[8] It is to the application of these jurisdictional principles to this appeal that we now turn.

### B.

We must assess, for each of the three claims presented on appeal—the excessive pepper spray claim, the excessive pressure claim, and the medical needs claim—whether the district court decided the claim based on qualified immunity, and if so, whether the officers challenge that legal determination on appeal.

### 1.

We begin with the district court's analysis regarding the excessive pepper spray claim. The court found that a number of genuine issues of fact remained unresolved, including whether Iko complied with the officers' orders during the extraction. *See Iko v. Galley*, No. 8:04-CV-

---

[8]This step is particularly important in interlocutory appeals regarding qualified immunity, because a party can so focus its appellate argument on factual disputes that it fails to raise a single legal question appropriate for appellate review. *See, e.g.*, *Johnson v. Jones*, 515 U.S. at 314 (dismissing appeal because the Court could not "find any 'separate' [legal] question—one that is significantly different from the fact-related legal issues that likely underlie the plaintiff[s'] claim on the merits").

3731-DKC, slip op. at 27, 60. This finding is precisely the type of factual determination over which we lack jurisdiction at this stage in the litigation. *See Johnson v. Jones*, 515 U.S. at 314.

The district court also held, however, that "[t]he existing case law . . . gave [Lt.] Shreve fair warning that multiple applications of pepper spray against a passive inmate who made at least some attempt at compliance, received no subsequent decontamination, and was forced to wear a spit mask, was unlawful," and that Lt. Shreve was therefore "*not entitled to qualified immunity for his use of pepper spray.*" *Iko v. Galley*, No. 8:04-CV-3731, slip op. at 32 (emphasis added). This determination is plainly legal in nature, and immediately appealable under the collateral-order doctrine. *See Mitchell*, 472 U.S. at 530.

Our jurisdictional analysis does not end there, however, as we must assure ourselves that the officers raised the appropriate legal question on appeal, and did not merely focus on rehashing the factual dispute below. We agree with Plaintiffs that the officers' appellate argument on this claim asks us to revisit a number of factual disputes. As explained in their briefs and extensively at oral argument, however, the officers *also* argue that the right to be free from an excessive deployment of force by pepper spray was not clearly established—a question of law that does not require us to revisit any factual disputes. We possess jurisdiction over such a legal determination. *See Johnson v. Jones*, 515 U.S. at 316.[9]

---

[9]We do not find Plaintiffs' citation to *Buonocare* to mandate a different result. In that case, the district court had denied qualified immunity to two officers who had searched the plaintiff's home. On appeal, this court held that the plaintiff had alleged the violation of a right protected by the Fourth Amendment, and that the right was clearly established, rendering a denial of qualified immunity appropriate. *See* 65 F.3d at 356-57. This court expressly did not consider the officers' appeals insofar as they sought review of whether the record set forth a genuine issue of fact. *See id.* at 361. Instead of affirming the district court's denial of qualified immunity, however, this court *dismissed* the appeals. *See id.*

Plaintiffs suggest that the disposition in *Buonocare*, namely that the appeals were dismissed instead of the order below being affirmed, controls the disposition here. Viewed holistically, however, *Buonocare* supports the approach we take today: deciding the legal questions related to

Having parsed the district court's findings and conclusions regarding the excessive pepper spray claim and scrutinized the officers' arguments made on appeal, we find a legal question that is ripe for our review. The pure issue of law is whether, "accepting the facts as the district court viewed them," *Winfield*, 106 F.3d at 530, and as supported by the videotape, *see Scott*, 127 S. Ct. at 1776, Lt. Shreve's continued use of pepper spray against Iko violated his clearly established constitutional right to be free from excessive force.

2.

With respect to the medical needs claim, the district court's order likewise comprises appealable conclusions of law and non-appealable determinations regarding facts. For example, the court found that "Plaintiffs have set forth sufficient proof to raise a genuine issue of material fact regarding whether the extraction team . . . consciously disregarded a known risk of harm to [Iko] by failing to insist that he be examined." *Iko v. Galley*, No. 8:04-CV-3731-DKC, slip op. at 42-43. As before, we have no jurisdiction to determine whether Plaintiffs have indeed come forward with sufficient facts to avoid summary judgment. *See Johnson v. Jones*, 515 U.S. at 314. The district court, however, also went on to hold that, in light of its reading of "existing case law[,] . . . [the officers are not] entitled to qualified immunity *under these circumstances*." *Iko v. Galley*, No. 8:04-CV-3731-DKC, slip op. at 43-44 (emphasis added). Again, on appeal, the officers argue about the contours of their legal duty to address Iko's medical needs and whether existing case law clearly established that he be treated, on the facts accepted by the district court. There is, therefore, a legal question appropriate for our review at this time: whether the officers' failure to secure medical care for Iko after he was doused in pepper spray and collapsed in the medical room violated Iko's clearly established right to have his medical needs addressed.

qualified immunity without passing on the district court's decision that factual disputes persist. Furthermore, to the extent that *Buonocare* can be said to be inconsistent with our hearing the instant appeals, the proper procedures governing cases in this posture were clarified one year later by the Supreme Court's decision in *Behrens*, 516 U.S. 299 (1996) (finding jurisdiction and reversing), as construed by this court sitting en banc in *Winfield*, 106 F.3d 525 (4th Cir. 1997) (same).

3.

Finally, with respect to the excessive pressure claim, Plaintiffs insist that the district court failed to consider the officers' qualified immunity defense at all, instead basing its finding solely on the existence of factual disputes regarding the level of force necessary to restrain Iko in the SOH cell. Because the district court so limited its analysis on this claim, Plaintiffs contend, there is no related legal question for the officers to appeal at this time. We agree.

The district court did not construe the officers' filings as raising the defense of qualified immunity with respect to this aspect of Plaintiffs' claims. *See Iko v. Galley*, No. 8:04-CV-3731-DKC, slip op. at 33. It cabined its analysis, therefore, to a direct review, without the overlay of qualified-immunity doctrine, of whether a factual dispute made summary judgment inappropriate. The court noted that, on the one hand, the officers may have restrained Iko "in a good faith effort to maintain control while flex cuffs were located to replace his metal handcuffs." *Id.* at 35. On the other hand, the court pointed out, it was not clear why the flex cuffs were not more readily available, and why such force was required when Iko "was not resisting and had been passive throughout the [transfer]." *Id.* The officers alleged that Iko had a history of performing feats of great strength in resisting restraints, and that their use of pressure was "commensurate with the officers' need for security." *Id.* at 36. The district court concluded that "it is not possible to determine as a matter of law whether [the officers] inflicted unnecessary and wanton pain and suffering." *Id.* at 35 (internal quotations omitted). "Given the conflicting inferences from the record," the court denied summary judgment as to this aspect of Plaintiffs' claims. *Id.* at 36.

We find that the district court's analysis can only be viewed as a determination that *factual disputes* persisted, rendering summary judgment inappropriate. The officers' protestations that the district court misread their filings, and that they had raised a qualified immunity defense to this claim, even if accurate, do not change the fact that we may only review those legal issues *decided* by the district court and subsequently argued on appeal. *See Winfield*, 106 F.3d at 529. Because the district court denied, by virtue of conflicting factual inferences, summary judgment on the claim that the application of

pressure to Iko constituted excessive force, there is no legal issue on appeal on which we could base jurisdiction. Therefore, this aspect of the officers' appeal must be dismissed.

In sum, we are left with two legal questions, one regarding the excessive pepper spray claim and the other regarding the medical needs claim. It is to these two legal questions that we now turn.

### III.

We review de novo the district court's partial denial of the officers' motion for summary judgment based on qualified immunity. *See Johnson v. Caudill*, 475 F.3d 645, 650 (4th Cir. 2007).

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. A court first determines whether any right was violated, and, if so, whether that right was clearly established. *See Miller v. Prince George's County, Md.*, 475 F.3d 621, 626-27 (4th Cir. 2007).

Officials' actions violate a "clearly established" constitutional right only if, "in the light of preexisting law[,] the unlawfulness" of the actions is apparent. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "We do not require of such officials the legal knowledge culled 'by the collective hindsight of skilled lawyers and learned judges,' but instead only 'the legal knowledge of an objectively reasonable official in similar circumstances at the time of the challenged conduct.'" *Johnson v. Caudill*, 475 F.3d at 650 (quoting *Jackson v. Long*, 102 F.3d 722, 731 (4th Cir. 1996)). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). In the end, the lodestar for whether a right was clearly established is whether the law "gave the officials 'fair warning' that their conduct was unconstitutional." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 313 (4th Cir. 2006) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

Here, Plaintiffs argue that the officers violated Iko's clearly established Eighth Amendment rights to be free from excessive force and to receive adequate medical care, and are thus not entitled to qualified immunity on their § 1983 claims. The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. In the prison context, it "protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). An inmate's Eighth Amendment claim involves a subjective component and an objective component. "Specifically, Eighth Amendment analysis necessitates inquiry as to whether the prison official acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)." *Id.* These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called "punishment," and absent severity, such punishment cannot be called "cruel and unusual." *See Wilson v. Seiter*, 501 U.S. 294, 298-300 (1991). The specific showings necessary to prove each component, however, "var[y] according to the nature of the alleged constitutional violation." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992). We therefore flesh out the components further in the context of each of the two Eighth Amendment violations before us.

A.

First, Plaintiffs claim that the amount of pepper spray used during the extraction constituted excessive force. The district court denied Lt. Shreve's claim of qualified immunity on this claim, finding that Lt. Shreve violated Iko's clearly established right to be free from excessive force. We agree.

1.

An injury is sufficiently serious for purposes of the objective component of an Eighth Amendment excessive force claim as long as it rises above the level of de minimus harm. *Hudson*, 503 U.S. at 9-10 (rejecting the argument that "minor" injuries are not actionable).[10]

---

[10]This rule comports with "society's expectations" regarding the use of force: if an inmate can show the malevolence required to prove the sub-

Lt. Shreve argues that Iko did not suffer at all from the pepper spray. He contends that pepper spray is "a non-lethal gas which is widely available" and that Iko "showed no symptoms of distress or pain." Appellants' Br. at 33. The state's own medical examiner, however, suggested that the pepper spray may have contributed to Iko's asphyxia and death. The district court, recognizing these conflicting accounts, found that issues of material fact remained regarding whether and to what extent the pepper spray contributed to Iko's death. Of course, we can only resolve the legal question here: whether, in the light most favorable to Plaintiffs, Iko's injury from the use of such quantity of pepper spray rose above the level of de minimus harm. Accepting as we must that Plaintiffs might be able to prove that Iko's death resulted from the excessive use of pepper spray, we easily conclude that Plaintiffs satisfy the objective component of their excessive force claim at this stage in the litigation.

Plaintiffs must also show that Lt. Shreve acted with a "sufficiently culpable state of mind" (the subjective component). *Wilson*, 501 U.S. at 298. The state of mind required in excessive force claims is "wantonness in the infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 322 (1986). Put differently, the "core judicial inquiry" regarding the subjective component of an excessive force claim is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7.

The Supreme Court has set forth four non-exclusive factors to assist courts in assessing whether an officer has acted with "wantonness": (1) "the need for the application of force"; (2) "the relationship between the need and the amount of force that was used"; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) "any efforts made to temper the severity of a forceful response." *Whitley*, 475 U.S. at 321 (internal quotations omitted) (applying these factors in a prison riot case); *see Hudson*, 503 U.S. at 7 (extending the *Whitley* standard "to all allega-

---

jective component, the actual injury suffered as a result of such malevolence need not be great for "contemporary standards of decency [to be] violated." *Id.* at 9.

tions of excessive force"). We now consider those factors in light of the circumstances before us.

With respect to the first criterion, there is no question that some dispersal of pepper spray was warranted in carrying out the cell extraction. The Maryland Division of Corrections Directive governing the use of force, DCD 110-23 (the "Use of Force Directive"), permits the use of pepper spray in a cell extraction "to incapacitate the inmate prior to committing staff" to the procedure. J.A. 588. Plaintiffs concede that pepper spray is a commonly used method of incapacitating inmates for this purpose. Lt. Shreve can therefore demonstrate that there was a "need for the application of force" because Iko did not initially comply with orders to "cuff up."

We next consider the relationship between the need for force and the amount of force that was used. Lt. Shreve testified that he was trained to use pepper spray until the inmate complied with orders. This contention cannot help Lt. Shreve on appeal, however, because the district court found that a genuine issue of material fact remained regarding whether Iko's offering of his hands through the door slot constituted "compliance" with the order to "cuff up" or not. As evident in the videotape and as found by the district court, Iko remained docile and passive throughout the cell extraction, and proffered his hands through the door, albeit in front of rather than behind him. In the light most favorable to Plaintiffs, then, Lt. Shreve deployed several additional bursts of pepper spray even after Iko attempted to comply with orders. Moreover, the Use of Force Directive governing the extraction unequivocally states that "[o]nly the *minimal* amount of chemical agents necessary shall be used in a given situation." J.A. 590 (emphasis in original). Under the second *Whitley* factor, these facts tend to show that the amount of force used was disproportionate to the need for force.

Likewise, the threat reasonably perceived by Lt. Shreve must have decreased as the spraying continued. Despite Lt. Shreve's characterization of Iko as "recalcitrant," Appellants' Br. at 28, Iko never reacted violently or otherwise became confrontational. Indeed, Lt. Shreve's final burst of pepper spray was deployed *after* Iko had lain down on the floor of his cell. The third factor therefore also favors Plaintiffs.

Finally, far from trying to ameliorate the effects of the pepper spray, Lt. Shreve and the extraction team never changed Iko's clothing, never removed the spit mask covering his nose and mouth, and never secured him any medical treatment for the exposure. As discussed more fully below, this failure to provide medical treatment directly contradicted the Use of Force Directive, which states that "[m]edical treatment *shall* be given to all persons exposed to chemical agents." J.A. 590. The fourth factor—any efforts made to temper the severity of a forceful response—thus favors Plaintiffs as well.

All told, these factors combine to provide an inference that Lt. Shreve wantonly inflicted pain upon Iko by deploying an excessive amount of pepper spray. As a matter of law, then, the facts viewed in the light most favorable to Plaintiffs support a finding that Lt. Shreve violated Iko's constitutional right to be free from excessive force.

2.

Lt. Shreve can still enjoy qualified immunity from suit if he can show that this constitutional right was not clearly established at the time of Iko's death. The district court found that the right here was clearly established. We agree.

We held over a decade ago that "[i]t is generally recognized that it is a violation of the Eighth Amendment for prison officials to use mace, tear gas *or other chemical agents in quantities greater than necessary* or for the sole purpose of infliction of pain." *Williams*, 77 F.3d at 763 (internal quotations omitted) (emphasis added). Notwithstanding this clear pronouncement, Lt. Shreve attempts to distinguish *Williams* on the grounds that it involved the use of mace, not pepper spray. *Williams*'s use of "or other chemical agents," *id.*, plainly reaches the use of pepper spray, and evinces the principle that "'[c]learly established' . . . includes not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked." *Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir. 1992). Because Lt. Shreve had "'fair warning' that [his] conduct was unconstitutional," *Ridpath*, 447 F.3d at 313, we hold that Iko's right to be free from excessive use of

pepper spray was clearly established, preventing an award of qualified immunity to Lt. Shreve on the facts before us.[11]

B.

Next, we turn to Plaintiffs' claim that the officers demonstrated deliberate indifference to Iko's medical needs when they failed to provide him with medical treatment after he was pepper sprayed. The district court denied the officers qualified immunity on this claim, noting that the officers' training and existing case law at the time required decontamination after the use of such an irritant. We agree.

Claims that prison officials failed to provide adequate medical care to an inmate, like excessive force claims, sound in the Eighth Amendment. *Williams*, 77 F.3d at 761. Again, there is a subjective and an objective component to showing a violation of the right. The plaintiff must demonstrate that the officers acted with "deliberate indifference" (subjective) to the inmate's "serious medical needs" (objective). *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

Beginning with the objective component, a "serious . . . medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999) (internal quotations omitted). The officers argue that Iko did not appear fazed by the pepper spray, and therefore Iko did not have a serious medical need at the time he

---

[11]Lt. Shreve's citation to *Grayson v. Peed*, 195 F.3d 692 (4th Cir. 1999), is unavailing. In *Grayson*, pepper spray was deployed once against an inmate when he attempted to crawl out of his cell, and again the next day when he tried to escape his cell by "jamming his foot in the doorway." *Id.* at 694. Though the inmate later died from an ensuing struggle with prison officials, this court found that the officers had not used excessive force against the inmate. *Id.* at 696. Aside from the passage of time between the two uses of pepper spray, *Grayson* differs substantially from this case because the inmate indisputably remained belligerent and kept trying to escape. *Id.* at 694. *Grayson* hardly suggests that five bursts of pepper spray are appropriate for an inmate who had not become confrontational.

was in the medical room. This argument fails for two reasons. First, the state's own medical examiner credited the pepper spray as contributing to Iko's death of asphyxia. It seems axiomatic that an inmate who dies in this way must have suffered some serious medical need that caused his death. Second, even a lay person would infer from Iko's medical room collapse that he was in need of medical attention. We conclude that Iko suffered from an objectively serious medical need after the pepper-spraying.

Plaintiffs must also show the subjective component—deliberate indifference. An officer is deliberately indifferent only when he "knows of and disregards" the risk posed by the serious medical needs of the inmate. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The subjective component therefore sets a particularly high bar to recovery. *See Grayson*, 195 F.3d at 695 ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it.").

This court has identified two slightly different aspects of an official's state of mind that must be shown in order to satisfy the subjective component in this context. First, *actual knowledge of the risk of harm* to the inmate is required. *Young v. City of Mt. Ranier*, 238 F.3d 567, 575-76 (4th Cir. 2001); *see also Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) ("It is not enough that the officer[ ] *should have* recognized it."). Beyond such knowledge, however, the officer must *also* have "recognized that *his actions were insufficient*" to mitigate the risk of harm to the inmate arising from his medical needs. *Parrish*, 372 F.3d at 303 (emphasis added).

With respect to knowledge of the risk of harm to Iko, the officers here undoubtedly possessed actual knowledge of the risk to Iko posed by their use of pepper spray. The Use of Force Directive itself requires that "medical treatment *shall* be given to all persons exposed to chemical agents." J.A. 590 (emphasis added). The chief of security at the WCI confirms that it is standard procedure for an inmate to be seen by a nurse and have his vital signs checked after a cell extraction. This court has also recognized that decontamination is the usual remedy for the pain associated with chemical irritants. *Williams*, 77 F.3d at 763.

The officers here were all aware that Iko had been doused in pepper spray; they had witnessed Lt. Shreve deploy it just minutes earlier

and had seen its effects first-hand when they entered the cell, with their gas masks on, to shackle Iko. Most significantly, the officers witnessed Iko collapse forward in the medical room, caught him, and directed him into a wheelchair. It is inconceivable that the officers here were not subjectively aware, even as lay persons not trained in medicine, that Iko was in need of medical attention after his collapse.

As explained above, however, under the high "deliberate indifference" standard, even subjective knowledge of Iko's medical needs is not enough; the officers must have *actually known that their response was inadequate* to address those needs (the second part of the subjective component). *Parrish*, 372 F.3d at 303. It is this element that the officers most vociferously challenge on appeal, contending that they were entitled to defer to the actions and medical decisions of the nurse. In essence, the officers argue that they believed they could delegate Iko's medical care to the nurse and be relieved of any further duty to monitor Iko's health. The officers cite to *Miltier v. Beorn*, 896 F.2d 848 (4th Cir. 1990), and to *Spruill v. Gillis*, 372 F.3d 218 (3d Cir. 2004), for support. As explained by the Third Circuit:

> If a prisoner is under the care of medical experts . . ., a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor.

*Id.* at 236; *see also Miltier*, 896 F.2d at 854-55 (finding prison officials not subject to supervisory liability for conduct of subordinate medical staff when supervisors had "closely monitored" the health of the inmate).

This case does not, however, present a situation in which prison officials might be held liable for the actions or inactions of a medical professional. The officers face liability for *their own* decisions, made while Iko was in their charge. The proposition elucidated in *Spruill* and *Miltier*—that a distant prison official can generally rely on his

medical staff's examinations and diagnoses—is therefore irrelevant to the issue before us.

This case is further distinguishable from the precedent on which the officers seek to rely because it is undisputed that Iko received *no* medical treatment whatsoever. There was therefore *no* medical opinion to which the officers could have deferred. Instead, the question here is whether the officers should be permitted to defer to the nurse's apparent decision *not to treat* Iko after he was pepper sprayed, and after he collapsed in their presence. The officers contend that Iko's silence in the face of the nurse's questioning constituted a refusal of medical treatment. Whether Iko's silence constituted a refusal is a question of fact that we cannot resolve, however. In the light most favorable to Plaintiffs, the facts show that Iko was nonresponsive to the nurse's inquiries, then collapsed in plain sight, but never received medical treatment.

The officers also contend that Iko was able to breathe fresh air for a few minutes while he was wheeled from the medical room to the SOH unit via an outdoor path, and that this provided an adequate alternative to receiving actual medical care. The Use of Force Directive provides that "[m]edical treatment *shall* be given to all persons exposed to chemical agents," J.A. 590 (emphasis added), and does not allow for "fresh air" to be substituted for medical treatment. We note as well that it is undisputed that, during Iko's foray outside, he still wore a skin-tight, pepper-spray soaked spit mask over his mouth and nose.

All told, viewing the facts in the light most favorable to Plaintiffs, the officers' actions—namely, shuttling Iko into a wheelchair upon his collapse without seeking any medical evaluation or even decontamination—were an insufficient response to Iko's serious medical needs. Because those needs were objectively serious and the officers were subjectively aware of that seriousness and chose to do nothing, the officers' actions on these facts violated Iko's Eighth Amendment right to adequate medical care.[12]

---

[12]Neither can the officers succeed in showing that this right was not clearly established. The right to adequate medical care had already been carefully circumscribed in the caselaw, with its objective and subjective components spelled out to ensure that only the most wanton indifference goes punished. The officers therefore had "'fair warning' that their conduct was unconstitutional." *Ridpath*, 447 F.3d at 313.

The district court therefore properly denied the officers' assertion of qualified immunity as to this claim.

## IV.

In sum, we find that we lack jurisdiction over one of the three claims presented on appeal, the claim that the application of pressure to Iko in the SOH cell constituted excessive force, because the district court denied summary judgment on the sole ground that issues of material fact remained. With respect to the other two claims, we affirm the district court's denial of qualified immunity, and thus summary judgment, to Lt. Shreve regarding the amount of pepper spray used against Iko and to the officers regarding their deliberate indifference to Iko's medical needs. The appeal is therefore

*DISMISSED IN PART AND AFFIRMED IN PART.*