**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 24-2103**

———————

SABARA FISHER ROBERTS, individually and as administrator of the estate of Adrian Roberts,

        Plaintiff - Appellee,

    v.

DEPUTY J. EVANS,

        Defendant - Appellant.

———————

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.  James C. Dever III, District Judge.  (5:21−cv−00356−D)

———————

Argued:  October 21, 2025                    Decided:  January 6, 2026

———————

Before DIAZ, Chief Judge, and THACKER and RUSHING, Circuit Judges.

———————

Dismissed by published opinion.  Chief Judge Diaz wrote the opinion, in which Judge Thacker and Judge Rushing joined.

———————

Reginald Bernard Gillespie, Jr., WILSON RATLEDGE, PLLC, Raleigh, North Carolina, for Appellant.  John Joseph Coyle, III, MCELDREW PURTELL, Philadelphia, Pennsylvania, for Appellee.

———————

DIAZ, Chief Judge:

This case arises from the tragic death of Adrian Roberts, a veteran in severe mental health distress. Tasked with executing an involuntary commitment order, law enforcement officers forcibly entered Adrian's home. Within seconds, Deputy Justin Evans shot and killed him.

Adrian's wife sued Evans for Fourth Amendment violations, including the use of excessive force. She alleged that Adrian's back was turned when Evans shot him. But Evans claimed that Adrian had charged the officers with a machete, requiring him to use deadly force.

The district court found disputes of material fact and denied Evans qualified immunity and summary judgment on the excessive force claim. Because that decision turned on issues of fact and not law, we lack jurisdiction over this appeal. So we must dismiss.

## I.

### A.

Adrian was a military veteran honorably discharged in 2005. When he returned home, Adrian struggled with a host of mental health disorders. He experienced severe paranoia and believed that "the state and federal governments were spying on and planning to attack him and that [the] neighborhood children were disguised as assassins." J.A. 579.

2

Adrian's wife, Sabara Fisher Roberts, asked a mental health counselor to evaluate him. She warned the counselor that Adrian "had machetes, knives, and daggers in his residence" and generally "kept them all within hands reach." J.A. 579. So for the counselor's safety, Deputies Dennis Doody and Jessica Jones accompanied her on the visit.

The counselor and deputies spoke with Adrian for a few minutes from the street while he remained inside his house. Adrian wasn't violent, but he was agitated and demanded that the group leave. As they left, Adrian came outside and filmed them.

The counselor told Sabara that Adrian could receive treatment only if Sabara filed an involuntary commitment order. Sabara had done so twice before, and she agreed again. She signed an affidavit that noted Adrian was "arming himself with throwing knives, mace and a machete which he keeps by his side even when he sleeps and showers," and that Sabara "fears for her and the children's safety." J.A. 585.

A magistrate judge issued a commitment order that same day and sent it to Captain Charles Parker at the Sheriff's Office. The order directed law enforcement to bring Adrian into custody within twenty-four hours. Parker ordered the Special Response Team—a group specifically trained to handle and de-escalate high-risk situations—to assist. Evans was a member of that team.

The officers devised a plan. Parker, Doody, and Jones would try to persuade Adrian to come outside while the Special Response Team hid nearby. If Adrian came outside, the Special Response Team would emerge and take him into custody. But if Adrian refused to leave his house, the officers would drive away in hopes that Adrian would come out to

3

film them (as he had during the mental health assessment).  The Special Response Team would then take him into custody.

B.

When the officers arrived at Adrian's house, the Special Response Team hid so that Adrian couldn't see them from inside.  Parker, Doody, and Jones approached a window to ask Adrian to talk.  But Adrian became hostile, refused to come outside, and demanded that they leave.[1]

As per their plan, Parker, Doody, and Jones drove away in hopes that Adrian would come outside to film them.  But he didn't.  Parker's superior then authorized the Special Response Team to forcibly enter Adrian's home.  Before that happened, Parker, Doody, and Jones returned to make one last attempt to persuade Adrian to come outside.  He refused.

Parker—who was peering into the home through a window—confirmed that Adrian had nothing in his hands and his back was toward the door.  He ordered the Special Response Team to enter.

One officer announced the team's presence and struck the front door with a breaching tool, but it failed to open.  At that point, Parker thought he saw Adrian pick something up and warned the team.  The officers breached the door on their second try, and Evans entered first.

---

[1] The parties dispute the length of this interaction; the district court determined it was somewhere between seven minutes and two hours.

4

Within seconds, Evans shot Adrian three times and killed him. His body was found lying face up next to two machetes. The autopsy report showed shots in Adrian's upper left back, the back of his left arm, and the outside of his left arm. The bullets' trajectory was generally from left to right, but the report made no findings about the order of the gunshot wounds.

C.

Sabara brought two Fourth Amendment claims against Evans under 42 U.S.C. § 1983, alleging unlawful entry and excessive force.[2] Evans moved for summary judgment.

The district court granted Evans qualified immunity and summary judgment on the unlawful entry claim. But it declined to do the same on the excessive force claim.

The district court found that factual disputes about Evans's use of force precluded summary judgment. It wasn't clear to the court "whether [Adrian] posed an immediate threat to the safety of the officers or others or was resisting arrest." J.A. 75.

Sabara relied on the autopsy report to argue that Adrian was facing away from the officers when Evans shot him, since he was shot in the back. But Evans insisted that he fired his weapon because Adrian ran at him while holding a machete above his head. Other officers testified to the same effect.

---

[2] Sabara initially brought claims against several other officers, but the parties agreed to dismiss all defendants except Evans and his superior, Sheriff Ennis Wright. The district court later granted Wright summary judgment, which Sabara doesn't appeal.

5

Evans also retained an expert forensic pathologist, who concluded that Evans's story was consistent with the autopsy report. The expert explained that, assuming Adrian had raised a machete over his head, his body would have been slightly turned to the side, so the force of the gunshots could have spun his body from left to right. But her report made no conclusive findings about the order of the gunshots or Adrian's conduct.

The district court concluded that the autopsy called Evans's story into question.[3] When that evidence was viewed in the light most favorable to Sabara, said the court, "[a] reasonable jury could find that . . . [Adrian] was unarmed and facing backwards when Evans shot him from eight feet away without any warning." J.A. 75. This factual dispute precluded qualified immunity and summary judgment, because "a reasonable jury could find that Evans violated [Adrian's] clearly established rights." J.A. 76.

This appeal followed.

## II.

We start (and end) with jurisdiction.

### A.

We generally review denials of qualified immunity on summary judgment de novo, applying the same legal standards the district court used. *See Halcomb v. Ravenell*, 992

---

[3] The district court also credited a photograph of Adrian's door, which purportedly showed that the officers could see into the house before they entered, and hearsay evidence that Adrian was only walking toward the officers with a pocketknife. But this evidence isn't material to our disposition.

F.3d 316, 319 (4th Cir. 2021). But since this order came to us on interlocutory appeal, we only have jurisdiction if presented with a "purely legal issue." *Ortiz v. Jordan*, 562 U.S. 180, 188 (2011) (quoting *Johnson v. Jones*, 515 U.S. 304, 313 (1995)). Such issues "typically involve contests not about what occurred, or why an action was taken or omitted, but disputes about the substance and clarity of pre-existing law." *Id.* at 190; *see also Pegg v. Herrnberger*, 845 F.3d 112, 117 (4th Cir. 2017) ("We have jurisdiction over a claim that there was no violation of clearly established law accepting the facts as the district court viewed them.") (citation modified).

But we lack jurisdiction "when the district court determines that factual issues genuinely in dispute preclude summary adjudication." *Ortiz*, 562 U.S. at 188. "We possess no jurisdiction over a claim that a plaintiff has not presented enough evidence to prove that the plaintiff's version of the events actually occurred." *Pegg*, 845 F.3d at 117 (citation modified). Nor can we "credit [the] defendant's evidence, weigh the evidence, or resolve factual disputes in the defendant['s] favor." *Hensley ex rel. N.C. v. Price*, 876 F.3d 573, 579 (4th Cir. 2017). That's true even if we might have assessed the factual record differently in the first instance. *See Hicks v. Ferreyra*, 965 F.3d 302, 308 (4th Cir. 2020) ("Whether we agree or disagree with the district court's assessment of the record evidence . . . is of no moment in the context of [an] interlocutory appeal.").

B.

As to jurisdiction, we must "carefully consider the order entered by the district court to assess the basis for its decision." *Iko v. Shreve*, 535 F.3d 225, 235 (4th Cir. 2008) (citation modified).

7

The order here doesn't require much parsing. The district court denied Evans qualified immunity because "genuine issues of material fact exist concerning Evans's use of force." J.A. 76. Most relevant is the autopsy report, which the court found "conflict[ed]" with Evans's testimony that Adrian charged at him. J.A 75–76.

As the district court explained, "if a jury found that [Adrian] was unarmed and that Evans shot [Adrian] in the back while [Adrian] receded from the door, a reasonable jury could find that Evans violated [Adrian's] clearly established rights." J.A. 76. This is well-established law in our circuit. *See Stanton v. Elliott*, 25 F.4th 227, 237 (4th Cir. 2022) ("[I]f the jury finds that [decedent] was shot in the back while unarmed and running away, that would violate his clearly established rights.").

And it's not the basis for Evans's appeal—he makes no argument that he would be entitled to qualified immunity under those circumstances. Instead, Evans "seek[s] review of a question that we may not consider in this interlocutory posture: whether the district court properly assessed the factual record in front of it." *Hicks*, 965 F.3d at 312.

Evans argues that it was reasonable for him to use deadly force because Adrian charged the officers while wielding a machete. But whether Adrian was running toward the officers is precisely the conduct that the district court found was in dispute. Evans asks us to correct the district court's view of the evidence. This we cannot do.

Because the district court's order turned on issues of fact, we don't have jurisdiction and must dismiss. *See Iko*, 535 F.3d at 235.

C.

To escape this result, Evans argues that we have jurisdiction because the factual disputes weren't genuine enough to withstand summary judgment. We disagree.

It's true that "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). So we can assert jurisdiction over a denial of qualified immunity at summary judgment if there isn't a genuine factual dispute. *See Elliott v. Leavitt*, 99 F.3d 640, 644 (4th Cir. 1996).

In *Scott*, an officer rammed the plaintiff's car to terminate a high-speed chase. 550 U.S. at 374–75. The plaintiff asserted that the roads were mostly empty and he had remained safely in control of his vehicle, so the lower courts found a factual dispute about whether he had posed a threat to pedestrians or other motorists. *Id.* at 378–79.

But the Supreme Court reversed. *Id.* at 376. The Court determined that there wasn't a genuine issue of fact because video evidence "blatantly contradict[ed]" the plaintiff's story, such that "no reasonable jury could have believed him." *Id.* at 380.

9

Here though, there isn't video footage or other objective evidence that demonstrably contradicts Sabara's version of the facts.[4]

In *Leavitt*, officers shot the decedent after he pointed a handgun at them through the window of a police car and ignored orders to drop it. 99 F.3d at 641–42. The plaintiffs argued that the decedent wasn't a real threat to the officers, since he was handcuffed and the window was rolled up, and they claimed that the police planted the gun on his body. *Id.* at 642, 644. But the plaintiffs' theory was supported only by mere speculation, and they "present[ed] no evidence to contradict the officers' testimony" that the decedent had pulled out a gun. *Id.* at 644.

While Sabara's evidence is far from overwhelming, it's more than pure speculation. The autopsy report is material evidence that could suggest Adrian was retreating when Evans shot him. *See Stanton*, 25 F.4th at 229 (evidence that the decedent was shot in the

---

[4] Evans argues that the wealth of officer testimony corroborating his perspective sufficiently undermines Sabara's claim. That evidence may be persuasive to a jury, but it doesn't compare to the video in *Scott*. *See Stanton*, 25 F.4th at 234 (where the officer has killed the only potential adverse witness, "[c]ourts should be careful at summary judgment to avoid simply accepting an officer's self-serving statements and must consider all contradictory evidence").

10

back was enough to call the officer's story into question and preclude qualified immunity at summary judgment).

We decline to forecast how Sabara will fare at trial.  We hold only that the autopsy report was enough to create a "genuine" issue of fact.  And that ends our analysis.

*DISMISSED*