**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-2196

LANCE L. SWICK,

Plaintiff - Appellee,

v.

JAMES WILDE; TOWN OF CHAPEL HILL, NORTH CAROLINA,

Defendants – Appellants,

and

CHRISTOPHER BLUE; RANDI MASON; LEO VEREEN,

Defendants.

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  Thomas D. Schroeder, District Judge.  (1:10-cv-00303-TDS-JEP)

Argued:  March 28, 2013                  Decided:  June 19, 2013

Before GREGORY, DUNCAN, and AGEE, Circuit Judges.

Remanded by unpublished opinion.  Judge Gregory wrote the opinion, in which Judge Duncan and Judge Agee joined.

**ARGUED:** Dan McCord Hartzog, CRANFILL, SUMNER & HARTZOG, LLP, Raleigh, North Carolina, for Appellants.  Robert Christopher Ekstrand, EKSTRAND & EKSTRAND, LLP, Durham, North Carolina, for Appellee.  **ON BRIEF:** Kari R. Johnson, CRANFILL, SUMNER & HARTZOG, LLP, Raleigh, North Carolina, for Appellants.

Stefanie A. Smith, EKSTRAND & EKSTRAND, LLP, Durham, North Carolina, for Appellee.

———————

Unpublished opinions are not binding precedent in this circuit.

GREGORY, Circuit Judge:

I.

Defendant-Appellants Officer James Wilde and Town of Chapel Hill appeal the district court's partial denial of summary judgment on the basis of qualified and public official immunity related to several of Plaintiff-Appellee Lance Swick's federal 42 U.S.C. § 1983 and state law malicious prosecution claims. The district court's denial of qualified immunity rested on its determination that there were genuine issues of material fact best decided at trial. Because this case does not ultimately turn on questions of law, and because the district court has not rendered a final decision pursuant to 28 U.S.C. § 1291, we do not have jurisdiction to consider this appeal. We therefore dismiss and remand for further proceedings.

II.

Because Appellants challenge the denial of qualified immunity on a motion for summary judgment, we are constrained to view the following facts in the light most favorable to Swick as the non-moving party. See ACLU of Md., Inc. v. Wicomico Cnty., Md., 999 F.2d 780, 784 (4th Cir. 1993).

In 2007, Lance Swick lived in the "82 Magnolia Apartments" complex in Chapel Hill, North Carolina, where he was an active participant in a lively social scene. He frequently organized

3

poolside parties and invited friends from 82 Magnolia, including Officer Randi Mason, who worked for the Chapel Hill Police Department. After Swick and Mason became friends, Mason began to date Appellant James Wilde, whom she eventually married. Mason subsequently began to distance herself from Swick's group of friends and the 82 Magnolia social scene.

In January 2007, while on patrol, Mason saw Swick's silver vehicle on the street. Because of a prior conversation with Swick, Mason suspected that his license had been revoked, and informed other officers to "be on the look out" for Swick because he had a "possibly revoked license." Later that evening, Wilde observed Swick, pulled him over, administered sobriety checks, and arrested Swick after determining that he was intoxicated.[1]

On May 20, 2007, Wilde and Mason were acting as off-duty courtesy officers at 82 Magnolia. At about 11:00 P.M., they witnessed a man they believed to be Swick walk down the stairway from an apartment, enter a silver vehicle, and drive off. After Mason contacted the police department's dispatch center and learned that Swick's license was revoked, she swore out a warrant for Swick's arrest for driving with a revoked license.

---

[1] Swick pleaded guilty in March 2008 to driving while impaired for the charge associated with this January 2007 arrest.

When Swick learned about the warrant, he turned himself in at the Chapel Hill Police Department. However, Swick claimed that he was in Durham that evening at a concert and that his car was impounded at the time.[2]

On May 27, 2007, Swick and his friends organized a poolside Memorial Day party. The attendees brought food and alcohol, and Swick drank while at the party. Wilde was on duty that day, but took a one-hour "fitness break," as permitted by the police department. He chose to swim at the pool during his break. When Swick learned that Wilde was in the pool, he told his friend, Tim Runfola, that he wanted to speak with Wilde to "clear the air." Runfola, who was worried that Wilde might be targeting Swick, told Swick he did not think it was a good idea to speak with Wilde and volunteered to discuss the matter with Wilde himself.

While Wilde was in the pool, he saw Swick speaking to some people, who Wilde says were gesturing towards him. Feeling uncomfortable, Wilde decided to leave the pool area. Runfola followed Wilde to have a conversation with him. Swick followed behind Runfola. Three friends who were at the party, Deepak Gopalakrishna, Carlos Alvarado, and Jason Bradley Downey, also

---

[2] After the relevant events in this case had transpired, a state court dismissed the May 20, 2007, charges against Swick.

5

followed at varying distances behind Swick. After walking about 100 yards, Wilde became concerned that the men were following him and decided to get into his personal vehicle and drive away. About a minute later, he decided he might be acting "paranoid," and returned to his apartment.

After Wilde parked his car, he popped his trunk and went to retrieve his gear, including his helmet and weapon. Wilde then saw the five men who had stayed in the area while Swick talked with a neighbor he knew. Swick approached Wilde and asked if he could speak with him. As they spoke, Runfola sat on a curb about twenty-five feet from Wilde in the pathway to Wilde's apartment. The three other men stood or sat about seventy-five feet away under a tree on a grassy island to avoid burning their feet on the hot pavement.

After Wilde agreed to the conversation, Swick asked Wilde why he was "charging [him] with all these charges" and "targeting [him] . . . and trying to throw [him] under the bus." Wilde responded that if Swick wanted it to stop then Swick should "stop breaking the law." Wilde ended the conversation abruptly and returned to his apartment. No one attempted to prevent Wilde from leaving.

During the course of the conversation, neither Swick nor Wilde raised his voice, gestured in anger, swore, or communicated any explicit threat. Wilde only sounded agitated

6

at the end of the conversation when he told Swick he did not want to speak further. Runfola, who could hear the two men talking, described the conversation as "totally calm . . . . Lance put out some questions. James gave his response." Gopalakrishna described the tone as "non-confrontational." He explained that Swick did not seem "agitated in any way. He seemed to be calm and in control of himself." Downey characterized Swick's demeanor as "fairly calm . . . he wasn't raising his voice or anything like that." Wilde explained that he did not feel that Swick did anything to intimidate him, but that he felt intimidated by "everyone there." He believes that the "manner in which the men followed him and spread out in the area was threatening."

That evening, Wilde discussed the incident with the on-duty supervisor at the police department, Leo Vereen. After hearing Wilde's story, Vereen consulted with a magistrate judge in the building who told Vereen he believed probable cause existed to support a warrant. The next morning, Wilde swore out a warrant for Swick's arrest on a felony charge of witness intimidation and a misdemeanor charge of communicating threats. Swick again turned himself in when he learned about the warrant. Wilde also testified in front of a grand jury, which returned a true bill of indictment. Before trial, the communicating threats charge

was dismissed. However, the felony intimidation charge moved forward to a jury verdict in Swick's favor.

On April 20, 2010, Swick filed a lawsuit containing seventeen causes of action against Wilde, the Town of Chapel Hill, and several individual officers. The causes of action included nine claims under 42 U.S.C. § 1983 and eight state causes of action, including malicious prosecution. Swick brought claims related to both his May 20 and May 27 arrests. The district court granted in part and denied in part Defendants' motion for summary judgment. The court granted summary judgment on all claims related to the May 20 arrest, but denied Wilde's motion for summary judgment on Swick's § 1983 claims for unreasonable seizure, criminalization of speech, retaliation, evidence fabrication, and state law malicious prosecution related to the arrest for the May 27 conversation. Id. While governmental immunity protects a municipality from vicarious liability in certain circumstances, see Evans v. Hous. Auth. of City of Raleigh, 602 S.E.2d 668, 670 (N.C. 2004), the district court recognized that the Town of Chapel Hill may have waived its governmental immunity defense due to its participation in an insurance risk pool, pursuant to North Carolina law. N.C. Gen. Stat. § 160A-485(a); Lyles v. City of Charlotte, 477 S.E.2d 150, 152 (N.C. 1996). Because the Town of Chapel Hill did not brief the matter or provide evidence related

8

to the extent of coverage, the court denied the Town's summary judgment motion on the state law malicious prosecution claim.

III.

Qualified immunity shields government officials from liability in a § 1983 suit as long as their conduct has not violated "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Typically, a denial of summary judgment is not appealable when no final order has issued. 28 U.S.C. § 1291; Jenkins v. Medford, 119 F.3d 1156, 1159 (4th Cir. 1997) (en banc). However, qualified immunity is an "immunity from suit rather than a mere defense to liability." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). As such, we may exercise jurisdiction over an interlocutory appeal of a denial of summary judgment based on qualified immunity to prevent a public official from enduring the hardship and distraction of trial.[3] Id. at 525-27. Specifically, a denial of qualified immunity is immediately appealable if "the issue appealed concern[s], not which facts the parties might be able to prove, but, rather, whether or not certain given facts showed a

---

[3] The law allowing limited interlocutory appeal of qualified immunity also applies to public official immunity. Taylor v. Ashburn, 112 N.C. App. 604, 606 (1993).

9

violation of clearly established law." <u>Johnson v. Jones</u>, 515 U.S. 304, 311 (1995). Of course, a district court's denial of qualified immunity typically contains both legal and factual determinations. As such, we must carefully consider the district court's order to assess the basis for its decision. <u>Id.</u> at 319. If the district court's denial rests solely on its finding that there were genuine issues of material fact, then we do not have jurisdiction and should proceed no further in our analysis. <u>Iko v. Shreve</u>, 535 F.3d 225, 235 (4th Cir. 2008).

Here, the district court identified the pivotal question in this case: whether Wilde was reasonable in his belief that probable cause existed for Swick's arrest on state law charges that he either communicated threats or intimidated a witness. See <u>Taylor v. Waters</u>, 81 F.3d 429, 434 (4th Cir. 1996) (explaining that an officer has probable cause if the totality of the circumstances known to the officer at the time "would warrant the belief of a prudent person that the arrestee had committed or was committing an offense"). Under North Carolina law, a person is guilty of a Class 1 misdemeanor for communicating threats if:

> (1) He willfully threatens to physically injure the person . . . ;
> (2) The threat is communicated to the other person, orally, in writing, or <u>by any other means</u>;
> (3) The threat is made in a manner and under circumstances which would cause a reasonable

10

> > person to believe that the threat is likely to be carried out; and
>
> > (4) The person threatened believes that the threat will be carried out.

N.C. Gen. Stat. Ann. § 14-277.1(a) (emphasis added).

A person is guilty of felony intimidation or interference with witnesses in North Carolina:

> If any person shall by threats, menaces or <u>in any other manner</u> intimidate or attempt to intimidate any person who is summoned or acting as a witness in any of the courts of this State, or prevent or deter, or attempt to prevent or deter any person summoned or acting as such witness from attendance upon such court . . . .

N.C. Gen. Stat. Ann. § 14-226 (emphasis added).

Because Swick did not communicate any oral or written threat, any potential basis for probable cause would fall under the catch-all provisions emphasized in the above statutes. The district court explained, however, that Wilde and Swick "paint[] a very different scene," of what happened such that it cannot be said as a matter of law that probable cause existed. <u>Swick v. Wilde</u>, 2012 WL 3780350, at *11 (M.D.N.C. Aug. 31, 2012) (unpublished). For instance, Wilde states that Swick and his friends "fanned out," "surrounded" him, blocked the escape route to his apartment, and "panicked" him to the point that he backed himself against his car to protect his rear in preparation for a physical altercation. Swick, on the other hand, describes a calm, non-threatening conversation that took place while his

11

friends stood or sat in a disinterested manner twenty-five to seventy-five feet away. After an extensive review of the factual disputes in the case, the district court concluded that genuine issues of material fact remained which prevented any determination that Wilde was entitled to qualified immunity as a matter of law. Id. at *13.

Wilde also argued before the district court that decisions by intervening adjudicators as to the existence of probable cause buffer him from liability. Specifically, he pointed out that a neutral magistrate issued a warrant, a grand jury returned an indictment, and a trial judge denied motions to dismiss, allowing the case to proceed to jury trial. We have explained that decisions by intervening adjudicators have a significant impact on the question of whether an officer was objectively reasonable in his belief that probable cause existed for an arrest. See, e.g., Durham v. Horner, 690 F.3d 183, 189 (4th Cir. 2012) (discussing the effect of an indictment issued by a properly constituted grand jury); Torchinsky v. Siwinski, 942 F.2d 257, 261-62 (4th Cir. 1991) (discussing relevance of a neutral magistrate's decision to issue a warrant and a district court judge's finding that probable cause was present). However, this protective effect does not shield officers who have "deliberately supplied misleading information that influenced the decision." Durham, 690 F.3d at 189 (internal

12

quotations omitted); cf. Evans v. Chalmers, 703 F.3d 636, 647–48 (4th Cir. 2012) (explaining that a prosecutor's decision to move forward with a case may constitute a superseding intervening cause, but that "officers may be held . . . liable when they have lied to or misled the prosecutor").

Here, the district court explained that Swick's characterization of the interaction was so different from Wilde's that there was a genuine dispute about whether Wilde "deliberately or recklessly misstated the facts" to the magistrate who issued the warrant. Swick, 2012 WL 3780350, at *12. We cannot exercise jurisdiction because any determination about the protective effect of the decisions made by intervening adjudicators rests on the outcome of the factual disputes at hand. To be clear, if Wilde's version of the facts is redeemed as accurate, then his corresponding characterization to the intervening adjudicators would provide him protection. But, if Swick's version of the facts ultimately rings true, then Wilde's mischaracterization of the events would render the protection offered by the decisions of intervening adjudicators unavailing.

The same factual disputes that underlie the district court's holding on probable cause also underlie its disposition on the surviving claims. For instance, the court found that the outcome of Swick's criminalization of speech claim will hinge in large part on the factfinder's determination of whether Swick

13

exhibited criminally threatening conduct. <u>Swick</u>, 2012 WL 3780350, at *17; <u>see</u> <u>Virginia v. Black</u>, 538 U.S. 343, 359-60 (2003) (holding that "true threats," or "statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual . . ." are not protected speech). Similarly, the court explained that the outcome of Swick's fabrication of evidence claim turns on whether Wilde misled the magistrate judge in seeking a warrant. <u>Swick</u>, 2012 WL 3780350, at *21. As such, the court's factual findings permeate the order and prevent us from reviewing this interlocutory appeal.

IV.

Wilde's version of the facts -- five men surrounding an officer to question him in an accusatory posture about pending criminal charges while cutting off his escape route -- differs substantially and materially from Swick's version of a calm conversation while his friends stood or sat at a distance. Although Wilde attempts to convince us that his appeal presents only a legal question based on undisputed facts, his arguments rely on his own version of the events, not Swick's. As the district court explained, this case ultimately will come down to the "credibility of the parties' witnesses." <u>Swick</u>, 2012 WL 3780350, at *14. Such a quintessential factual dispute is not

14

immediately appealable. We therefore dismiss the appeal for lack of jurisdiction and remand to the district court for further proceedings.

REMANDED