**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 12-7722**

———————

JAMES DENNEY,

       Plaintiff - Appellee,

    v.

MARK TUCKER; JONATHAN WIGFALL; TINA MAYBANK, each sued
individually,

       Defendants – Appellants,

    and

BERKELEY COUNTY; WAYNE DEWITT, Sheriff of Berkeley County,
in his official capacity and as an individual; DEPUTY 1;
DEPUTY 2, and various other Deputies John Does presently
unknown; JONATHAN MENZIE; CRYSTAL THOMPSON,

       Defendants.

———————

Appeal from the United States District Court for the District of
South Carolina, at Columbia. Richard M. Gergel, District Judge.
(3:10-cv-01383-RMG)

———————

Argued: September 19, 2013      Decided: November 4, 2013

———————

Before DUNCAN and THACKER, Circuit Judges, and Gina M. GROH,
United States District Judge for the Northern District of West
Virginia, sitting by designation.

———————

Dismissed by unpublished per curiam opinion.

———————

**ARGUED:** James Albert Stuckey, Jr., STUCKEY LAW OFFICES, LLC, Charleston, South Carolina, for Appellants. Gregg Meyers, JEFF ANDERSON & ASSOCIATES, St. Paul, Minnesota, for Appellee. **ON BRIEF:** Alissa R. Collins, STUCKEY LAW OFFICES, LLC, Charleston, South Carolina, for Appellants. J. Graham Sturgis, Jr., J. GRAHAM STURGIS, JR. & ASSOCIATES, Charleston, South Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

James Denney ("Denney" or "Appellee") filed suit pursuant to 42 U.S.C. § 1983, inter alia, against Berkeley County Detention Center officials Private Mark Tucker, Private First Class Jonathan Wigfall, and Sergeant Tina Maybank (collectively, "Appellants"), alleging that Appellants failed to protect him from imminent harm at the hands of other inmates, in violation of the Eighth and Fourteenth Amendments to the United States Constitution. Appellants filed a motion for summary judgment based on qualified immunity, which the district court denied.

We possess jurisdiction over a denial of qualified immunity only to the extent the district court's decision rests on an issue of law. Because the qualified immunity determination in this matter ultimately turns on unresolved questions of fact, rather than resolution of a pure legal issue, we do not possess jurisdiction over this appeal. Therefore, we dismiss.

I.

Appellants challenge the denial of qualified immunity on a motion for summary judgment; therefore, we review the facts in the light most favorable to Denney, the non-moving party. See Hensley v. Koller, 722 F.3d 177, 181 (4th Cir. 2013).

3

On September 29, 2008, Denney was arrested for allegedly committing a Lewd Act Upon a Child Under Sixteen and booked at the Berkeley County Detention Center ("jail") as a pretrial detainee. Appellants were on duty at the jail on that date and, along with two other officers, were charged with supervising over 300 inmates. At around 10 p.m., Maybank placed Denney in Pod C-1, which was an overflow pod that included violent pre-trial and post-conviction offenders, even though the Minimum Standards for Local Detention Centers in South Carolina require "separate management" for those accused of sex offenses. See J.A. 276-77.[1] There were around 60 inmates in Pod C-1 but beds for only 24 of them.[2]

Before he was placed in Pod C-1 and while he was in the holding cell, Denney reviewed his paperwork, which indicated

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

[2] There is no dispute that Maybank knew the crime for which Denney was arrested because she attended his bond hearing. See J.A. 519. Maybank also admitted that due to "overcrowding" on the night of September 29, 2008, there is "a possibility" that there were people in Pod C-1 with "assaults in their background," and agreed Denney "might be the target of some violence in the jail just by the nature of his charges." Id. at 472-73. Maybank explained the jail attempted to keep violent offenders separated from non-violent offenders and agreed that, in theory, "the purpose of th[at] classification system is to keep people with violent backgrounds away from people that might be more exposed to being the targets of violence," but she also stated, "you can't always do that." Id. at 470-71, 475.

4

his identifying information, the charge of committing a Lewd Act Upon a Child Under Sixteen, and the bond amount. Denney noticed another inmate reading the paperwork over his shoulder. That inmate then allegedly spread the word around Pod C-1 that Denney was a "child rapist." J.A. 115. Denney lied and said he was arrested for being a felon in possession of a firearm.

Around 10:15 p.m., Denney called his parents and told them he was "[s]cared to death to go to sleep" and "there will probably be a fight here before the night's over." J.A. 264, 270. After 11 p.m., a bail-bondsman, Ernest Davis, phoned Maybank and told her that Denney told his father he was in danger. Maybank did not check on Denney, however, because she believed Denney would be bonded out in the morning and would spend only nine hours in the jail. She also explained that Denney had not told her directly that he was in danger, and he could have used the intercom in Pod C-1 to contact her if he needed help.

Denney testified that, during the night, he was repeatedly struck by the other inmates in Pod C-1 with a broom handle, a pay phone handset, a urine-soaked towel, and a pair of underwear loaded with feces. This conduct went unnoticed by Appellants.

At some point before breakfast was served at 4 a.m., an inmate began soliciting other inmates to convene a kangaroo

5

court with a "judge [and] jury" to "tr[y]" Denney on the charge against him.  J.A. 654.  The inmates told Denney they were going to beat him when the opportunity presented itself.  Denney testified, "I knew what was coming . . . .  They told me when the lights went out I would get beat."  Id. at 121.

When breakfast was served, Denney said he did not want breakfast, but two of the inmates told him to get in line and stand between them.  While in the breakfast line, Denney told Tucker he was "scared":

> I told [Tucker] I couldn't go in [the pod].  He asked me why.  I said, ["]because I'm terrified for my life to go back in there because they're threatening to beat me when the lights go out.["]  He said, ["]There's nothing I can do about that . . . [W]hat I will do is relay the message and we will get back with you . . . I'll get back with you later.["]  I said, ["]well, later's going to be too late.["]

J.A. 238.  Tucker reported this conversation to his supervisor, Wigfall, because Wigfall had more experience.  Tucker did not take additional action at that point.

Wigfall admitted he knew Denney desired to be transferred out of Pod C-1.  He "informed P[rivate] Tucker that [he] would handle the situation as soon as [they] were finished feeding [the inmates]."  J.A. 165.  Wigfall felt that it would only take five to ten minutes to finish feeding the inmates, and then he could timely handle the situation involving Denney.  Wigfall said he did not immediately check on Denney because the

6

inmates "would get more riled up, which would cause a more disturbing feeding." Id. at 697. Wigfall directed Tucker to complete the lockdown of inmates in Pod B, finish distributing medications, and then check on Denney. Wigfall stated,

> I made a judgment call based on my experience there, knowing that a lot of inmates say, okay, we just want to move because they want to go to another certain area. They just want to go to another certain area of the jail which they're not allowed to go to, and we were almost finished [feeding] the pods . . . .

Id. at 144.

Once the breakfast trays were collected, the inmates began their "trial," found Denney to be "guilty," and "sentence[d]" him to a "brutal beating." J.A. 127-28. Denney also testified that the inmates covered the video camera and intercom in the pod with wet toilet paper, which also went unnoticed by Appellants. The inmates proceeded to beat Denney for five minutes, causing him to sustain "severe injury to [his] hand[,] face[,] and head," and leaving him completely deaf in his right ear. Id. at 259, 535. At that point, which was around 20 minutes after Denney told Tucker of the impending harm, Tucker, who was now in the observation tower overlooking the breakfast area, heard a loud noise over the intercom system

7

from Pod C-1. He responded, and radioed Wigfall that he needed assistance.[3]

Denney ultimately pled guilty to Assault and Battery of a High and Aggravated Nature. He claims the beating that occurred in this case "cause[d] him to plead to an offense he did not commit . . . to avoid the risk of being imprisoned with the original charge[.]" Appellee's Br. 19-20. Denney sued Tucker, Wigfall, and Maybank -- as well as Berkeley County, Berkeley County Sheriff Wayne DeWitt, and jail officials Jonathan Menzie and Crystal Thompson -- pursuant to 42 U.S.C. §§ 1983, 1985, 1986, and 1988, and South Carolina law.[4] Tucker, Wigfall, and Maybank filed a motion for summary judgment based on qualified immunity. The district court, upon the recommendation of the magistrate judge, denied qualified immunity to all three. See Denney v. Berkeley Cnty., No. 3:10-1383, 2012 WL 3877732 (D.S.C. Sept. 5, 2012). They timely appealed that ruling.[5]

---

[3] The record also includes evidence of previous harm other inmates had experienced at the jail. For example, inmate Christopher Wolf stated he was "jumped" on two occasions in the week preceding Denney's incident, and "beat . . . up too [sic] the point that [he] hardly could move". J.A. 526.

[4] This appeal regards only Denney's claims with respect to individual liability of Appellants pursuant to 42 U.S.C. § 1983.

[5] The district court also dismissed defendants Crystal Thompson and Berkeley County, and granted summary judgment in (Continued)

8

We review a district court's denial of summary judgment based on qualified immunity de novo. Hensley v. Koller, 722 F.3d 177, 181 (4th Cir. 2013). Summary judgment is appropriate if a party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At the summary judgment stage, "to the extent that the district court has not fully set forth the facts on which its decision is based, we assume the facts that may reasonably be inferred from the record when viewed in the light most favorable to the plaintiff." Hensley, 722 F.3d at 181 (internal quotation marks and alteration omitted).

We must first and foremost, however, "satisfy ourselves of our appellate jurisdiction over th[is] case." Ranta v. Gorman, 721 F.3d 241, 245 (4th Cir. 2013).

III.

A.

In determining whether an official is entitled to qualified immunity, "a court must decide (1) whether the [official] has violated a constitutional right of the plaintiff

---

favor of defendants Jonathan Menzie and Sheriff Wayne DeWitt. These rulings are not before us in this appeal.

and (2) whether that right was clearly established at the time of the alleged misconduct." Bland v. Roberts, --- F.3d ---, No. 12-1671, 2013 WL 5228033, at *19 (4th Cir. Sept. 18, 2013). Usually, a denial of summary judgment is not appealable where no final order has issued. See 28 U.S.C. § 1291; Jenkins v. Medford, 119 F.3d 1156, 1159 (4th Cir. 1997) (en banc). However, a denial of qualified immunity is immediately appealable if "the issue appealed concern[s], not which facts the parties might be able to prove, but, rather, whether or not certain given facts show[] a violation of clearly established law." Johnson v. Jones, 515 U.S. 304, 311 (1995) (internal quotation marks omitted); see also id. at 317 ("[I]mmunity appeals interfere less with the final judgment rule if they are limited to cases presenting neat abstract issues of law." (internal quotation marks and alterations omitted)).

Thus, we possess jurisdiction over a district court's denial of qualified immunity "'to the extent that [the denial] turns on an issue of law.'" Iko v. Shreve, 535 F.3d 225, 234 (4th Cir. 2008) (quoting Mitchell v. Forsyth, 472 U.S. 511, 530 (1985)) (emphasis omitted). Critically, however, "we lack jurisdiction to re-weigh the evidence in the record to determine whether material factual disputes preclude summary disposition." Id. As such, we must attempt to "parse[] the district court's findings and conclusions regarding" Denney's claim, and "assure

10

ourselves that the officers raised the appropriate legal question on appeal, and did not merely focus on rehashing the factual disputes below." Id. at 235, 236. If the "appealing official seeks to argue . . . that the evidence presented was insufficient to support a conclusion that the official engaged in the particular conduct alleged," then "we do not possess jurisdiction under § 1291 to consider the claim . . . ." Winfield v. Bass, 106 F.3d 525, 529 (4th Cir. 1997) (en banc).

B.

Here, the district court concluded, "Plaintiff Denney has shown that a genuine issue of material fact exists as to whether Defendants Tucker, Wigfall, and Maybank violated his Fourteenth Amendment rights." Denney v. Berkeley Cnty., No. 3:10-1383, 2012 WL 3877732, at *8 (D.S.C. Sept. 5, 2012). The district court also correctly identified the legal issue at play, i.e., whether "by 2008 it was clearly established that immediate action, or something approaching it, was required of the prison officials who knew of an imminent, serious threat to the physical safety of a pretrial detainee," and held,

> [T]his Court concludes that [the officers] violated a
> clearly established constitutional right[] of which a
> reasonable person would have known, for a prison
> official presented with an immediate, serious threat
> to a prisoner's safety, and capable of taking
> effective action safely, to disregard that risk
> completely, as Maybank is alleged to have done, or to
> postpone action for the sake of timely serving a meal,
> as Tucker and Wigfall are alleged to have done. Such

11

a basic obligation would have been readily apparent under the law existing at the time.

Id. at *8-9 (internal quotation marks, citation, and alteration omitted).

Of course, "nearly every 'decision of a district court denying a governmental official's request for summary judgment based upon qualified immunity will encompass' both a factual and a legal determination -- 'that the facts are sufficiently controverted to warrant a trial and that the legal right purportedly violated was clearly established.'" Iko, 535 F.3d at 234-35 (quoting Winfield, 106 F.3d at 529) (emphasis in original). Here, the district court's order necessarily assumes facts in making its legal conclusion: the officials were presented with an "immediate" and "serious" threat; they were "capable of taking effective action" and doing so "safely"; and they "disregarded that risk completely" or "postpone[d] action for the sake of timely serving a meal." But, as explained below, the genuineness of these facts is the very issue Appellants raise in this court.

Although Appellants maintain that they raise a purely legal issue based on undisputed facts, the substance of their arguments belie that assertion. They undoubtedly ask us to resolve disputed facts in their favor and base our legal ruling on those facts. Moreover, Denney quibbles with Appellants'

12

stated version of the facts. For example, following is a non-exhaustive list of fact-based arguments made in the briefs and at oral argument:

- "Under the facts and circumstances confronting Pvt Tucker, being one person short [Officer Hamlet] of their normal staff of six (to supervise 300 prisoners) due to illness, the need to feed the inmates, and the need to herd inmates picking up their food trays in the day room back into their cells, none of Pvt Tucker's actions or inactions were unreasonable." Appellants' Br. 21. Compare Appellee's Br. 26 ("[T]he record reflects the staffing level was meaningless."), with Appellants' Rep. Br. 4 ("It's perplexing for Denney to argue that the absence of detention officer Hamlet did not make any difference. If Hamlet had not been absent it would have helped the situation because the shift would not have been shorthanded and the time interval between the officers being available to react would have been shortened." (citations omitted)).

- "Tucker's actions were 'reasonable' both for purposes of due process and what he 'could have believed' for qualified immunity for various reasons[,] [including] the staff was short handed and stressed because officer Hamlet, who was absent, would have assisted with the feeding." Appellants' Br. 21 (emphasis in original).

- "It seems almost without quibble that Tucker could have believed it was not a constitutional violation to complete his required and administrative duties which he was in the act of doing, in a crowded jail, immediately after reporting to his superior officer Appellee's concerns" and "[h]e did not do so because he felt a time pressure to complete his assigned administrative tasks."

13

Id. at 22 (emphasis in original) (internal quotation marks omitted).

- "Wigfall knew it would take only 5 to 10 minutes to finish feeding B pod and felt the time it would take to finish feeding the inmates would still enable him to timely handle the situation involving Appellee." Id. at 23 (citation omitted).

- "Appellee argues that he was improperly assigned because he was placed in Pod C-1 with violent inmates. Appellee was not misassigned because he was charged with a Lewd Act Upon [a] Child Under Sixteen, a felony and violent crime under South Carolina law. Patently, for assignment and classification purposes, Appellee was as violent as any of the other inmates." Id. at 25 (emphasis in original) (internal quotation marks omitted).

- "[R]eadily available alternatives . . . were present at all times to have protected Mr. Denney but [they] were not used to protect him until after he was beaten." Appellee's Br. 25. (Appellants did not respond to this argument.)

- "[A] five, or ten, or 20 minute delay to serve breakfast is [not] an appropriate approximation of an immediate response." Appellee's Br. 34.

- Appellee lists "other options" for responding to Denney's fears, in addition to the options conceded by Appellants, that would have "protected . . . Denney." Id. at 34–35.

- "There is an allegation . . . that [Denney] was wrongfully assigned. We disagree with that." Oral Argument at 01:23-01:31, Denney v. Tucker (No. 12-7722), available at

14

http://www.ca4.uscourts.gov/oral-argument/
listen-to-oral-arguments.[6]

We simply do not possess jurisdiction to conduct review of these facts pursuant to Johnson and its progeny, and it is improper for us to decide the legal issue in question with regard to disputed versions of the facts as set forth above. See Johnson, 515 U.S. at 314 (dismissing case for lack of jurisdiction because the Court could not "find any . . . 'separate' [legal] question -- one that is significantly different from the fact-related legal issues that likely underlie the plaintiff's claim on the merits"); Witt v. W. Va. State Police, 633 F.3d 272, 277-78 (4th Cir. 2011) ("[T]he troopers' attempt to rehash the factual dispute below provides no basis for interlocutory appeal of the district court's order denying summary judgment on qualified immunity grounds." (internal quotation marks and alteration omitted); McKenna v. City of Royal Oak, 469 F.3d 559, 561 (6th Cir. 2006) ("While the officers assert that they raise only the legal issue of whether the facts set forth by McKenna constitute a violation of clearly

---

[6] In addition, Appellants clearly raised issues of fact in their summary judgment motion. See J.A. 89 ("[T]he extent of the 'warning' given by plaintiff Denney to . . . Tucker is contested."); id. at 91 ("In this case, the correctional officers were not aware of an excessive risk to plaintiff Denney because he did not communicate or identify the risk or what he was scared of." (internal quotation marks omitted)).

15

established law, all three arguments advanced by the officers on the issue of qualified immunity in fact rely on their own disputed version of the facts . . . ." (internal quotation marks and alteration omitted)).[7]  Therefore, we are constrained to dismiss this appeal.

IV.

For the foregoing reasons, we dismiss this appeal for lack of jurisdiction.

DISMISSED

---

[7] See also Swick v. Wilde, No. 12-2196, 2013 WL 3037515, at *5 (4th Cir. June 19, 2013) (dismissing appeal for lack of jurisdiction where "[a]lthough Wilde attempts to convince us that his appeal presents only a legal question based on undisputed facts, his arguments rely on his own version of the events, not Swick's."); Landrum v. Bowens, 373 F. App'x 370, 371 (4th Cir. 2010) (dismissing appeal for lack of jurisdiction, stating, "[a]lthough the district court did make a legal determination that there was a clearly established right to reasonable medical care, Appellants do not challenge that determination, but instead the fact-related issues regarding whether certain actions occurred that could amount to a constitutional violation").